ALLEN M. WILSON AND JERRY A. WILSON, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wilson v. Commissioner
Docket Nos. 12611-77, 12612-77, 12613-77, 12614-77, 12615-77, 12617-77.
United States Tax Court
T.C. Memo 1980-514; 1980 Tax Ct. Memo LEXIS 69; 41 T.C.M. (CCH) 381; T.C.M. (RIA) 80514; November 20, 1980, Filed Peter R. Stromer and Norma R. Bell, for the petitioners. Gerald J. Beaudoin, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to and heard by Special Trial Judge Daniel J. Dinan, pursuant to the provisions of section 7456(c) of the Internal Revenue Code[2] and General Order No. 6 of this Court. [3] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined the following deficiencies in the petitioners' Federal income taxes: Docket No.
Taxable Year Ended
Deficiency
12611-77
12/31/72
$ 537.78
12612-77
12/31/72
699.08
12613-77
12/31/72
741.81
12614-77
12/31/72
3,041.30
12615-77
12/31/72
257.26
12617-77
5/31/73
937.43
*71 Due to concessions by the petitioners, the issues remaining for decision are: (1) whether petitioners, at the time they purchased real property, intended to remove the prune trees situated thereon; (2) whether petitioners have met their burden of proof with respect to the value of the prune trees; (3) whether petitioners are entitled to an abandonment loss deduction for the prune trees; and (4) whether petitioners are entitled to a casualty loss deduction for the prune trees. [4]
The deficiencies is issue result from an operating loss taken in 1972 by a limited partnership, South Valley Freeway Properties, Ltd., of which petitioners were limited partners. The amount of distributable partnership *72 loss was affected by this deduction. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact together with exhibits attached thereto are incorporated herein by this reference. At the time the petitions in these proceedings were filed petitioners Allen M. and Jerry A. Wilson in Docket No. 12611-77, husband and wife, resided in Gilroy, California; John E. and Alvah P. Pearson in Docket No. 12612-77, husband and wife, resided in Morgan Hill, California; Lewis D. and Mary J. Meyers in Docket No. 12614-77, husband and wife, resided in San Jose, California; Arthur L. and Joan Silveira in Docket No. 12615-77, husband and wife, resided in Concord, California; and Herman A. and Ladean S. Christensen in Docket No. 12617-77, husband and wife, resided in Gilroy, California. The Christensens filed a timely joint Federal income tax return for the taxable year ended May 31, 1973. The other above-mentioned parties filed timely joint Federal income tax returns for the taxable year ended December 31, 1972. All returns were filed with the Director, Internal Revenue Service Center, Fresno, California. At the time of filing his petition in Docket No. 12613-77, Terry *73 L. Pearson, an individual, resided in Roseville, California. The petitioner timely filed a Federal income tax return for the taxable year ended December 31, 1972, with the Director, Internal Revenue Service Center, Fresno, California. In early 1971, Charles R. Rietz (hereinafter referred to as Rietz), met with a Mr. Larry Frisone, a real estate salesman in Gilroy, California, to explore possible investment opportunities in the Gilroy area for a partnership Rietz was then forming. Gilroy is located south of San Jose, California, in Santa Clara County. Rietz was doing business as Charles Scott & Co., a sole proprietorship which was organized for the purpose of seeking investment opportunities, particularly those involving real estate syndication. Frisone informed Rietz that a Mrs. Lena Rizzuto was selling a parcel of property (hereinafter referred to as the Rizzuto property) in the Gilroy area. Frisone's agency, L & L Properties, had the exclusive listing for the property. The Rizzuto property consisted of approximately 13.1 acres and was planted with 900 prune trees. The property had 507 feet of existing frontage on Highway 101. The property was zoned for agricultural use *74 and was being leased to a Mr. Joseph Barberi. The lease provided that Barberi would receive 80% of the gross from the sale of the prunes each year, and Mrs. Rizzuto would receive the remaining 20%. During the course of their negotiations, Frisone furnished Rietz with a copy of a document entitled "Property Fact Sheet," which detailed the above-mentioned specifics regarding the Rizzuto property. At the time that this document was presented to Rietz, it did not have a notation under the heading "crops." It was Frisone's impression that Rietz wanted the property for investment purposes, not for raising prunes. The property was situated approximately 200 feet from the proposed interchange of the South Valley Freeway and Highway 101. Upon completion of the construction, the Rizzuto property would have over 500 feet of freeway frontage adjacent to the new six-lane freeway to San Jose. Although the prune trees were not discussed in any detail, Rietz did seek Frisone's opinion about placing an appropriate value on the trees in the event he decided to remove them at some future date. On January 28, 1971, Rietz approached a Mr. Edwin S. Gottlieb, a real estate syndication and financial *75 consultant, to discuss the suitability of the Rizzuto property for real estate snydication. At that meeting, Rietz indicated to Gottlieb that he was of the opinion that a tax deduction could be secured if the prune trees on the Rizzuto property were removed. Gottlieb differed with Rietz, and informed him that the Treasury Regulations and cases thereunder made it clear that a deduction would not be allowed if he intended to remove the trees at the time the property was acquired. In addition, Rietz, either prior to or during the meeting with Gottlieb, made the following notation on the "Property Fact Sheet" (obtained at his earlier meeting with Frisone) under the heading "crops": Cut trees--write off 90 trees/acre X 40 = 3,600 X 13 acres = 46,800 Lease for row cropping 120/acre X 13 = 1,560/year In the summer of 1971, prior to purchasing the Rizzuto property, Rietz sought advice on prune farming from a local office of the California Agricultural Extension Division Service. At that time Rietz was made aware of the fact that numerous prune tree orchards in the Santa Clara area were being removed. Actually, the prune market in Santa Clara County had been declining steadily since *76 1966. For the crop years 1966-1971, the production of California dried prunes in Santa Clara County was as follows: [5]
Year
Natural Condition Tons
1966
34,753
1967
33,573
1968
31,203
1969
21,320
1970
31,261
1971
19,496
In addition to the decline in the prune market, prune trees in Santa Clara County were infested by "shot-hole" beetles and infected with a disease known as oak-root fungus, both of which necessitated the removal of numerous prune trees.These conditions were present in the Rizzuto orchards and had existed for several years prior to 1971. The insect infestation problem on the Rizzuto property had not increased substantially from 1971 to 1972, and any increase was partially attributable to a lack of care for the orchards. However, despite these problems many new trees had been planted on the Rizzuto property; the orchard consisted of approximately 60% old trees and 40% new trees. On August 11, 1971, the petitioners and Rietz formed a California *77 limitedpartnership, South Valley Freeway Properties, Ltd. (hereinafter referred to as SVFP, Ltd.) pursuant to the Uniform Limited Partnership Act. Rietz was the general partner and the petitioners were involved as limited partners. The percentage interests of the various partners were as follows: Profit Sharing
Partner
Percentage
Wilson, Allen M. and Jerry A.
8.5%
Pearson, John E. and Alvah P.
8.5%
Pearson, Terry L.
8.5%
Meyers, Lewis D. and Mary J.
42.5%
Silveira, Arthur L. and Joan
4.25%
Christensen, Herman A. and Ladean S.
12.75%
Rietz, Charles R.
15.0%
SVFP, Ltd., had its principal place of business at 17110 Copper Hill Drive, Morgan Hill, California. In pertinent part, the limited partnership agreement for SVFP, Ltd., provided: 3. Purpose. The Principal purpose of this limited partnership is to purchase and hold for long term investment that certain real property consisting of approximately 13 acres in the County of Santa Clara [Rizzuto Property] * * * The partnership purposes and and [sic] powers include engaging in any and all activities or pursuits related or incidental to its principal purpose and business. 6. *78 General Partner. a. Authority. The general partner shall have sole and complete charge of the affairs of the partnership, and operate the partnership business for the benefit of all partners. The general partner shall have authority to act on behalf of the partnership in all matters respecting the partnership, its business, and its property. * * * In conjunction with the sale of limited partnership interests in SVFP, Ltd., Rietz and his associates drafted a private offering memorandum which set forth a projected "depreciation schedule." The schedule listed the 900 prune trees, valued at $36,000, as a depreciable asset with a remaining useful life of 10 years. On August 12, 1971, Rietz purchased 12.2 acres of the Rizzuto property. The remainder,.9 acre, was conveyed to Rietz on the same date by deed of gift. Mrs. Rizzuto held the first mortgage on the property which she sold to Rietz. The land sales contract provided that Mrs. Rizzuto's permission was required before any trees in the prune orchard could be removed. On August 12, 1971, Rietz sold the Rizzuto property to SVFP, Ltd. Shortly after the sale, in August 1971, the prune crop on the Rizzuto property *79 was harvested. Pursuant to the terms of the agricultural lease in effect at the time, Barberi received 80% ($3,592.40) of the proceeds from the sale of the prunes, and SVFP, Ltd., received the remaining 20% ($898.10). On October 11, 1971, Rietz sent a partnership report to the limited partners which, in pertinent part, provided: Prune crop
Our sharecrop farmer informs me that all of the prunes have now been harvested and are being dried. Although the exact figures are not yet available, the estimated tonage [sic] is 30-40 tons dry; and the estimated price is $250-300 per ton. This figures out to a gross of $7,500-12,000. Our 20% share will be from $1,500-2,400, which will cover the real estate taxes. Payment will be made in approximately two months. We can feel very forunate that the above yield, because the prune market in this area is dropping and becoming economically unfeasable [sic]. It is for this reason that management is considering removing the trees and converting to a row crop farm lease at $125 per acre or $1,500 per year totally. This move is contemplated for 1972 or 1973 depending on tax counsil's [sic] advise [sic]. This brings us to the *80 next subject. Tax Position Change
When we take out the prune trees, the remaining undepreciated value of the trees will be totally deductable [sic] in that year. This will accellerate [sic] and increase the immediate tax shelter to all investors. As an example, if we do this in 1972, the write-off will be $33,500 totally or $1,675 per unit in that year. This will effect a sizeable tax savings for all of us and thus further reduce our after tax holding cost. Thus, there appears [sic] to be a double benefit in this move: additional tax shelter and a guaranteed income to go toward property taxes. I will keep you informed as to our final decision in this area. General Report
* * * I personally, along with my associates, feel that the meat packing plant will increase the value of our property--how much is difficult to say. Past experience has shown that anytime agricultural property is 'up-zoned' to industrial, the value increases. * * * It is also interesting to note that Ramada Inn and Holiday Inn are interested in putting a motel in Gilroy, and are seriously considering locating near the interchange south of town near our property. * * * All in all, *81 from the above information you can see that there is much reason for optimism about our realizing a good capital gain from our investment. There is a lot happening and more to come. You haven't seen anything yet compared to when the freeway is completed. In early 1972, Barberi suggested to Rietz that, in light of the decline in the prune market and the insect infestation problem, it would be prudent to get out of the prune farming business and convert the Rizzuto property to row crops. Barberi had been considering this since 1968 and, in fact, had been gradually getting out of the prune farming business since that time. Sometime in 1972, after securing Mrs. Rizzuto's permission, Rietz told Barberi to remove the prune trees and convert the land to row crops. The agricultural lease, providing for Barberi to receive 80% of the gross and SVFP, Ltd., the balance, remained in effect with respect to the row crops. For the taxable year 1972, SVFP, Ltd., timely filed a Federal partnership income tax return with the Director, Internal Revenue Service Center, Fresno, California. On the return, SVFP, Ltd., claimed a $34,500.00 depreciation deduction for the alleged "abandonment" of 900 *82 prune trees during 1972. The loss was distributed as follows: Partners
Distributive Share
Allen M. and Jerry A. Wilson
$ 2,934.30
John E. and Alvah Pearson
2,934.30
Terry L. Pearson
2,934.30
Lewis D. and Mary J. Myers
14,673.50
Arthur L. and Joan Silveira
1,528.65
Herman A. and Ladean S. Christensen
4,401.95
$29,407.00 [6]
The respondent disallowed the $34,500.00 depreciation deduction claimed by SVFP, Ltd., and, accordingly, disallowed each petitioners' distributive share of ordinary loss from the partnership reported on their Federal income tax returns. In the statutory notices of deficiency respondent disallowed the claimed deduction on the following grounds: (1) It has not been established that all or any portion of the $34,500.00 is deductible under section 167.* * * (2) Furthermore, since the partnership purchased the real property upon which the prune trees were situated with the intention of *83 removing said trees therefrom, no deduction is allowable under section 165. * * * ULTIMATE FINDINGS OF FACT 1. SVFP, Ltd., purchased the Rizzuto property for real estate investment purposes. 2. SVFP, Ltd., purchased the Rizzuto property with the intention of removing the prune trees situated thereon. OPINION Intent
Section 165 allows as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. In the case of individuals, Section 165(c) provides that the loss is allowable only if incurred in a trade or business or incurred in a transaction entered into for profit though not connected with a trade or business (excluding casualty losses). Under this section a taxpayer may receive a deduction when a building, used in a trade or business or in a transaction entered into for profit, is demolished. Section 1.165-3(b), Income Tax Regs.[7] The amount of the loss, if it is established that the taxpayer is entitled to a demolition deduction, is equal to the portion of the purchase price of the improved realty that is allocable to the building. Section 703(a) makes this provision applicable in computing the taxable income *84 of a partnership. [8]
However, it is a well-established rule that where property is purchased with the intention *85 of demolishing the existing buildings either immediately or subsequently, no loss is allowed on the demolition of the buildings. Liberty Baking Co. v. Heiner, 37 F. 2d 703 (3rd Cir. 1930); Lynchburg National Bank & Trust Co. v. Commissioner, 20 T.C. 670 (1953), aff'd. 208 F. 2d 757 (4th Cir. 1953); Sec. 1.165-3(a)(1), Income Tax Regs.[9] The entire basis of the property, increased by the net cost of demolition or decreased by the net proceeds from demolition, is allocated to the land only. [10] The rationale for this rule was stated in Lynchburg National Bank & Trust Co., supra, as follows at 673-674: *86 Where, as here, there is a purchase of land with the intent to demolish a building situated thereon and erect a new one, no part of the price paid is allocable to the building, since it is deemed that the building has no value to the purchaser and it is the land which is purchased and which alone has value. The entire purchase price, therefore, represents the cost of the land and becomes the purchaser's basis.* * * Where the taxpayer, having purchased the property with the intent to demolish the buildings, actually uses the buildings in a trade or business or for the production of income before their demolition, a portion of the purchase price may be allocated to the buildings. [11] In that event, a portion of the purchase price of the property may be allocated to the buildings and depreciated over the period they are so held or used. Sec. 1.165-3(a)(2)(i), Income Tax Regs.[12]
*87 Whether the taxpayer's intention to demolish existed at the time the property was acquired is clearly a question of fact. The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property or demolished the buildings, but depends upon an examination of of all the surrounding facts and circumstances. [13]Sec. 1.165-3(c), Income Tax Regs. The regulations list a series of factors to assist in making the necessary determination. Section 1.165-3(c)(2) and (3). [14]
*88 As is evident from the above discussion, the regulations under section 165 deal with a situation involving the question of whether the taxpayer acquired real property with the intent, at the time of purchase, to demolish buildings situated thereon.By analogy, we find these regulations equally applicable to this case involving the removal of prune trees from real property acquired by purchase. In fact, in Eaton v. Commissioner, 1936-239 P-H B.T.A. Memorandum Decisions, affd. 95 F. 2d 628 (9th Cir. 1938), [15] the Board of Tax Appeals made such an analogy in the context of a factual situation virtually identical to the one we are confronted with in the instant case. *89 Eaton,supra, involved the issue of whether or not the taxpayer-petitioner was entitled to deduct from his income in 1928, amounts representing a loss resulting from removing 3,788 apple and pear trees from real property acquired by purchase in that year. For approximately 35 years, petitioner had been engaged in the business of growing fruit and vegetables in Watsonville, California. In 1928, he had roughly 100 acres planted in apples and 75 acres in apricots. Although he had previously grown strawberries on a large scale, at the time of the taxable year in question he was engaged principally in the growing of lettuce. The production of lettuce in the Watsonville area had increased significantly since 1921. In an effort to enlarge his land holdings, petitioner purchased three tracts of land planted primarily in apple and pear trees. The Court found that petitioner purchased the land for the purpose of extending the business in which he was already engaged (growing of lettuce).Therefore, any loss that was sustained by reason of the destruction of the apple and pear trees was incurred in the course of petitioner's trade or business. Immediately after purchasing *90 the land petitioner, based on the results of a survey he requested, began the destruction of 3,428 apple and 360 pear trees determined to be unprofitable to market. The Court found that petitioner intended to destroy the trees at the time he purchased the land. In support of this conclusion, the Court pointed out that the purchase was motivated by his desire to obtain the land for general purposes rather than the fact that the land was planted in apple and pear trees. Although petitioner did intend to keep the trees determined to be profitable, based on the survey's results and in keeping with the intention indicated, the trees which appeared profitable were saved and the remaining trees were destroyed. In addition, the court found that petitioner's purchase of the land was heavily influenced by two factors: first, that the soil was black and adaptable to his general use; and, secondly, that the tracts were advantageously situated with reference to land which he already owned and the highway. Petitioner contended that the decision to destroy the trees was made subsequent to the purchase, and further that the decision was precipitated by the fact that a subsequent slump in the *91 apple market indicated that apples could not be grown profitably. However, the evidence at trial showed that the slump in the apple market did not occur until January of 1929, while the destruction of the trees began in October of 1928. Finally, at trial, the respondent produced a witness who testified to the effect that petitioner told him that he bought the land for the production of lettuce, not for growing apples and pears. The Court concluded its opinion as follows (1936-239 P-H B.T.A. Memorandum Decisions, at p. 240): As we read the law, the regulations [16] and the opinion of the court, the finding as to whether or not the petitioner in the purchase of the land in question, intended to destroy the trees, which the facts show he did destroy and in respect of which the deduction herein is claimed, is determinative of the question as to whether or not a loss was actually incurred. If the petitioner at the time he purchased the land had no intention of utilizing the trees which were destroyed but intended to destroy them and use the land for other purposes, then it cannot be said that any part of the cost of the property was allocable to the trees so destroyed, and under such *92 circumstances, the trees destroyed having no cost basis, it cannot be said that the petitioner sustained a loss by reason of their destruction. Having found as a fact that the petitioner did intend to destroy the trees at the time he purchased the land, we hold that he sustained no deductible loss by reason of their destruction. *93 In determing whether SVFP, Ltd., intended to remove the prune trees on the Rizzuto property at the time of purchase, we find it necessary to scrutinize Rietz's intentions who, as general partner, had all the management responsibilities. [17] Therefore, in dealing with the intent issue, no distinction will be made between Rietz and SVFP, Ltd.; the terms will be used interchangeably. In addition, the burden of proof is on petitioners to show that the respondent's determination is incorrect.Rule 142, Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111, 115 (1933). Petitioners contend that the intent to remove the prune trees was formed subsequent to purchasing the Rizzuto property. In support of this contention, petitioners argue that the decision to remove the trees resulted from a "sudden" decline in the prune market after acquiring the property. We do not accept this argument for the following reasons: first, prior to purchasing the property, Rietz was informed by the local office of the California Agricultural Extention Division Service that *94 numerous prune tree orchards in the Santa Clara area had been removed. This should surely have put him on notice that the prune market was experiencing a decline and, therefore, the decline in the prune market can hardly be characterized as sudden (with respect to SVFP, Ltd.) in light of Rietz's prior knowledge of the situation, existing at the time the property was purchased. Secondly, regardless of whether or not Rietz had prior knowledge that the prune market was declining, it is clear that the decline was not sudden but, in fact, was gradual. In a report published by the California Prune Advisory Board and Administrative Committee (p. 6, supra) which documented the production of dried prunes in Santa Clara County for the crop years 1966-1971, it is apparent that the prune market in the Santa Clara area had been gradually declining since 1966. In 1966 the report shows that 34,753 natural condition tons of dried prunes were produced in Santa Clara County. This figure declined in each of the five successive years, with the exception of 1970, to a production of 19,496 tons in 1971. It is inappropriate to label a decline of this nature as being sudden. Petitioners also argue *95 that the decision to remove the prune trees resulted from a "sudden" infestation by insects which occurred subsequent to acquiring the Rizzuto property. Petitioners point out that this argument is substantiated by the fact that the prune orchard consisted of 60% old trees and 40% new trees, which indicates that the insect infestation was sudden since, as a general rule, new trees are not planted when such a problem exists. Although it is true that 40% of the orchard consisted of new trees, we do not find that fact to be determinative as to whether or not the insect infestation was sudden. Instead, we assign more weight to the fact that the Rizzuto orchards had been infested by "shot-hole" beetles for several years prior to 1971, when the property was purchased. Furthermore, there is no indication that there was a sudden increase in the insect infestation subsequent to the date the property was purchased.Any increase which did occur at this time was partially attributable to a lack of care for the orchards by SVFP, Ltd. Therefore, we reject petitioners' argument that the decision to remove the prune trees was brought about by a sudden infestation by insects, as that problem existed *96 prior to purchasing the property and did not increase suddenly after acquiring the property. Petitioners argue further, in support of their contention that the intent to remove the prune trees was formed subsequent to purchasing the Rizzuto property, that they had planned from the outset to use the trees in the prune farming business. First, petitioners bolster this argument by noting that SVFP, Ltd., was, in fact, engaged in the prune farming business in 1971; however, we find to the contrary. Although the partnership did receive $898.10 as its 20% share of the proceeds from the sale of the prune crop in 1971, this income did not result from SVFP, Ltd., being engaged in the prune farming business in that year. Actually, it was Mrs. Rizzuto and Mr. Barberi who were engaged in the prune farming business in 1971. However, because the prune crop was harvested in late August, shortly after the date on which the property was purchased, the right to Mrs. Rizzuto's 20% share of the crop income for 1971 was evidently transferred to SVFP, Ltd., along with ownership rights to the land. SVFP, Ltd., was merely engaged in the harvesting phase of the prune farming business in 1971, and *97 did this only because it was a necessary step to be taken in order to realize income from the prune crop. Any prudent businessman would have decided to harvest the prune crop if faced with a similar situation, whether in the prune farming business or not, rather than lose a potential source of income by deciding not to harvest the crop. The first full year in which SVFP, Ltd., could have been in a trade or business was in 1972. However, it is clear that SVFP, Ltd., was not involved in the prune farming business in 1972 either, as during that year the prune trees were removed and the land was converted to row crops. Secondly, petitioners point out that their intent to be involved in the prune farming business is also evidenced by the fact that the private offering memorandum for SVFP, Ltd., set forth a projected "depreciation schedule" which listed the 900 prune trees as a depreciable asset with a remaining useful life of 10 years. However, merely laying out a projected depreciation schedule for a particular asset is not necessarily synonymous with using that asset in a trade or business. This factor, in and of itself, is not sufficient to demonstrate that SVFP, Ltd., was in *98 the prune farming business. We find that Rietz did not purchase the Rizzuto property in order to engage in the prune farming business, but instead purchased the property for real estate investment purposes. It is hard to imagine why a prudent businessman would purchase the Rizzuto property to raise prunes in light of the decline in the prune market and the insect infestation problem that existed at that time. On the other hand, it is easily understandable why one would purchase the property for real estate investment purposes. The property was situated only 200 feet from a proposed interchange for the South Valley Freeway and Highway 101. Upon completion of the construction, the Rizzuto property would have over 500 feet of freeway frontage making this area very desirable for commercial development, i.e., hotels, motels, and restaurants. Rietz was undoubtedly seeking the property, on behalf of SVFP, Ltd., for its real estate investment potential. This finding is substantiated by the following: first, Rietz made a living in the real estate investment field. He was doing business as Charles Scott & Co., a sole proprietorship organized for the purpose of seeking investment opportunities *99 in real estate snydication. Second, it was Mr. Frisone's impression that Rietz was interested in the property for investment purposes, not for prune farming. Third, Rietz sought Mr. Gottlieb's advice on real estate snydication with regard to the Rizzuto property. Finally, the limited partnership agreement for SVFP, Ltd., provided that the principal purpose of the partnership was "to purchase and hold for long-term investment that certain real property consisting of approximately 13 acres in the County of Santa Clara [Rizzuto Property]." Although we have found petitioners' arguments unconvincing for the reasons given above, we do not feel that the intent issue can be resolved solely on this basis. Sec. 1.165-3(c), Income Tax Regs., provides that the determination as to intent depends upon "an examination of all the surrounding facts and circumstances." Accordingly, we find it necessary to consider the following factors also, which clearly demonstrate that SVFP, Ltd., intended to remove the prune trees from the Rizzuto property at the time of purchase: First, during negotiations concerning the purchase of the Rizzuto property, Rietz sought Mr. Frisone's advice about placing *100 an appropriate value on the prune trees in the event he decided to remove them at some future date. It is apparent from this conversation that Rietz was considering removing the prune trees if SVFP, Ltd., purchased the Rizzuto property. Secondly, several events transpired during the meeting between Rietz and Gottlieb on January 28, 1971, that clearly indicate that Rietz intended to remove the prune trees when SVFP, Ltd., acquired the Rizzuto property. At this meeting, Rietz informed Gottlieb that he felt confident that a tax deduction could be obtained if the prune trees were removed. Furthermore, Rietz, either prior to or during the meeting with Gottlieb, made the following notation on a "Property Fact Sheet" (obtained from Frisone) under the heading "crops": Cut trees--write off 90 trees/acre X 40 = 3,600 X 13 acres = 46,800. Lease for row cropping 120/acre X 13 = 13,560/year At this point, it is obvious that Rietz stepped beyond the contemplating stage when he began to calculate what amount could be deducted when the trees were removed and how much income could be generated by leasing the property for row cropping. It is doubtful that anyone would inform two parties *101 on different occasions that he intended to remove trees from property he was planning on purchasing, calculate the amount of the tax deduction for removing the trees, and calculate the amount of income that could be generated by converting the land to row crops, unless the individual actually intended to remove the trees at the time he purchased the property. Thirdly, on October 11, 1971, Rietz sent a partnership report to the limited partners (pp. 8 and 9, supra) less than a month after purchasing the Rizzuto property. In that report Reitz informed the limited partners that the management of SVFP, Ltd., was considering removing the prune trees and converting to a row crop farm lease as the prune market in the Santa Clara area was "dropping and becoming economically unfesable [sic]." On the other hand, petitioners contend that the decision to remove the prune trees and convert to row crops was initiated by Mr. Barberi. However, Mr. Barberi did not suggest to Rietz until early 1972 that the trees be removed, whereas the partnership report, expressing a similar desire by Rietz, was released on October 11, 1971. Rietz had formed the intent to remove the prune trees and convert *102 to row crops long before Barberi suggested the same to him. The fact that such a short amount of time elapsed between the date the property was acquired (August 12, 1971) and the date on which Rietz decided that the trees should be removed, allows a reasonable inference to be drawn that Rietz intended to remove the prune trees at the time of purchase. And, Rietz did, in fact, have the prune trees removed shortly after this. The report goes on to inform the limited partners that when the prune trees are removed, the remaining undepreciated value ($34,500) will be totally deductible. Finally, the report indicates that the management was optimistic about the chances of realizing a substantial capital gain on the investment for the following reasons: first, the Rizzuto property would probably be "up-zoned" from agricultural to industrial; second, the Ramada Inn and Holiday Inn were considering the area around the Rizzuto property as a possible site for a motel due to its proximity to the freeway interchange; and third, the land would appreciate further when the freeway was completed. Again, it is impossible to make a determination as to Rietz's intent at the time he acquired the *103 Rizzuto property based solely on one or two facts. However, when all the facts are viewed together, we find that Rietz intended to remove the prune trees at the time the Rizzuto property was purchased. Therefore, pursuant to Sec. 1.165-3(a)(1), Income Tax Regs., the entire basis of the property purchased shall be allocated to the land only and, consequently, the prune trees will have a zero cost basis. As a result, we must sustain respondent's determination disallowing the $34,500.00 deduction claimed by SVFP, Ltd., on its 1972 Federal partnership income tax return for the removal of the prune trees from the Rizzuto property as it cannot be said that a deductible loss was sustained by reason of their removal. Accordingly, each petitioners' distributive share of ordinary loss from the partnership reported on their Federal income tax return is disallowed. Value Attached to Prune Trees
In a situation falling within the provisions of Sec. 1.165-3(a)(1), Income Tax Regs., as determined above, the entire basis of the property purchased is allocated to the land only. Therefore, the prune trees have a zero cost basis to petitioners. Casualty Loss
We do not find it necessary *104 to respond to petitioners' arguments that they should be allowed a deductible loss for the removal of the prune trees under a casualty loss theory. Since we have determined that the prune trees have a zero cost basis, petitioners cannot be said to have sustained a deductible loss, under any theory, for the removal of the prune trees. Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: John E. Pearson and Alvah P. Pearson, Docket No. 12612-77; Terry L. Pearson, Docket No. 12613-77; Lewis D. Meyers and Mary J. Meyers, Docket No. 12614-77; Arthur L. Silveira and Joan Silveira, Docket No. 12615-77; and Herman A. Christensen and Ladean S. Christensen, Docket No. 12617-77.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. Pursuant to the order of assignment, on the authority of the "otherwise provided" language of Rule 182, Tax Court Rules of Practice and Procedure↩, the post-trial procedures set forth in that rule are not applicable to these cases.
4. The parties stipulated that the only issue to be decided by the Court was whether petitioners are entitled to an abandonment loss deduction. However, at trial and in their briefs, both parties addressed the additional issues set forth above. Pursuant to Rule 41(b)(1), Tax Court Rules of Practice and Procedure↩, we find that the additional issues were tried by implied consent of the parties and, accordingly, they shall be treated in all respects as if they had been raised in the pleadings.
5. Report dated May 1973, entitled "California Prune Industry, Marketing Program 1966-1971," published by the California Prune Advisory Board and the Prune Administrative Committee.↩
6. The distributive share attributable to the general partner, Rietz, is not at issue herein, thus accounting for the difference of $5,093.00 between the abandonment loss claimed by SVFP, Ltd., and the total figure set forth above.↩
7. § 1.165-3. Demolition of buildings. (b) Intent to demolish formed subsequent to the time of acquisition. (1) Except as provided in subparagraph (2) of this paragraph, the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition. See paragraph (c) of § 1.165-1 relating to amount deductible under section 165↩. The basis of any building acquired in replacement of the old buildings shall not include any part of the basis of the property demolished. 8. Section 703(a) provides in part: SEC. 703.PARTNERSHIP COMPUTATIONS. (a) Income and Deductions. The taxable income of a partnership shall be computed in the same manner as in the case of an individual * * *↩
9. § 1.165-3 Demolition of buildings. (a) Intent to demolish formed at time of purchase. (1) Except as provided in subparagraph (2) of this paragraph, the following rule shall apply when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediatly or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a)↩ on account of the demolition of the old buildings even though any demolition originally planned is subsequently deferred or abandoned. The entire basis of the property so purchased shall, notwithstanding the provisions of § 1.167(a)-5, be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition. 10. Id.↩
11. Sec. 1.165-3(a)(2)(i) states: If the property is purchased with the intention of demolishing the buildings and the buildings are used in a trade or business or held for the production of income before their demolition, a portion of the basis of the property may be allocated to such buildings and depreciated over the period during which they are so used or held. The fact that the taxpayer intends to demolish the buildings shall be taken into account in making the apportionment of basis between the land and buildings under § 1.167(a)-5. In any event, the portion of the purchase price which may be allocated to the buildings shall not exceed the present value of the right to receive rentals from the buildings over the period of their intended use. The present value of such right shall be determined at the time that the buildings are first used in the trade or business or first held for the production of income. If the taxpayer does not rent the buildings, but uses them in his own trade or business or in the production of his income, the present value of such right shall be determined by reference to the rentals which could be realized during such period of intended use. The fact that the taxpayer intends to rent or use the buildings for a limited period before their demolition shall also be taken into account in computing the useful life in accordance with paragraph (b) of § 1.167(a)-1. ↩
12. Id.↩
13. Sec. 1.165-3(c)(1) provides: (c) Evidence of intention. (1) Whether real property has been purchased with the intention of demolishing the buildings thereon or whether the demolition of the buildings occurs as a result of a plan formed subsequent to their acquisition is a question of fact, and the answer depends upon an examination of all the surrounding facts and circumstances. The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property of demolished the buildings, but such statements, if made, are relevant and will be considered. Certain other relevant facts and circumstances that exist in some cases and the inferences that might reasonably be drawn from them are described in subparagraphs (2) and (3) of this paragraph. The question as to the taxpayer's intention is not answered by any inference that is drawn from any one fact or circumstance but can be answered only by a consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom. ↩
14. Sec. 1.165-3(c)(2) and (3) provide: (2) An intention at the time of acquisition to demolish may be suggested by: (i) A short delay between the date of acquisition and the date of demolition; (ii) Evidence of prohibitive remodeling costs determined at the time of acquisition; (iii) Existence of municipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes; (iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or (v) Inability at the time of acquisition to realize a reasonable income from the buildings. (3) The fact that the demolition occurred pursuant to a plan formed subsequent to the acquisition of the property may be suggested by: (i) Substantial improvement of the buildings immediately after their acquisition; (ii) Prolonged use of the buildings for business purposes after their acquisition; (iii) Suitability of the buildings for investment purposes at the time of acquisition; (iv) Substantial change in economic or business conditions after the date of acquisition; (v) Loss of useful value occurring after the date of acquisition; (vi) Substantial damage to the buildings occurring after their acquisition; (vii) Discovery of latent structural defects in the buildings after their acquisition; (viii) Decline in the taxpayer's business after the date of acquisition; (ix) Condemnation of the property by municipal authorities after the date of acquisition; or (x) Inability after acquisition to obtain building material necessary for the improvement of the property.↩
15. Eaton was heard originally by the Board of Tax Appeals and a decision was entered for the respondent pursuant to a Memorandum Opinion (1934-93 P-H B.T.A. Memorandum Decisions). A petition for review was filed, and the United States Circuit Court of Appeals for the Ninth Circuit reversed and remanded the case to the Board of Tax Appeals for a specific finding "on the question of whether or not the loss incurred by the taxpayer was incurred in the course of his trade or business," and for a further specific finding as to "whether or not the taxpayer at the time he purchased the land intended to destroy the trees," and for such further proceedings as might be required in accordance with the opinion and judgment of the Court (81 F. 2d 332 (9th Cir. 1935)). Pursuant to the Ninth Circuit's mandate, the Board of Tax Appeals, based on its specific findings, held for the respondent (1936-239 P-H B.T.A. Memorandum Decisions). The Ninth Circuit affirmed the decision (95 F. 2d 628↩ (9th Cir. 1938).
16. Treas. Regs. 77, Art. 172, promulgated under the Revenue Act of 1932, 47 Stat. 169, provided as follows: Art. 172 [Reg. 77]. Voluntary removal of buildings. Loss due to the voluntary removal or demolition of old buildings, the scrapping of old machinery, equipment, etc., incident to renewals and replacements will be deductible from gross income. When a taxpayer buys real estate upon which is located a building, which he proceeds to raze with a view to erecting thereon another building, it will be considered that the taxpayer has sustained no deductible loss by reason of the demolition of the old building, and no deductible expense on account of the cost of such removal, the value of the real estate, exclusive of old improvements, being presumably equal to the purchase price of the land and building plus the cost of removing the useless building. This regulation was the predecessor of Regulation Sec. 1.165-3(a)(1)↩.
17. Paragraph 6(a) of the limited partnership agreement for SVFP, Ltd. (p. 7, supra↩).