# United States Tax Court

T.C. Memo. 2024-100

TERRY L. WRIGHT AND CHERYL A. WRIGHT,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent[1]

————

Docket No. 30957-09.                    Filed October 30, 2024.

————

*Anthony J. Rollins* and *John Phillip Tyler*, for petitioners.

*Christopher S. Kippes*, *Sharmeen Ladhani*, *Siang L. Sang*, *Judy M. Tejeda-Gonzales*, *Daniel L. Timmons*, and *Krista J. Wood*, for respondent.

SUPPLEMENTAL MEMORANDUM
FINDINGS OF FACT AND OPINION

MARVEL, *Judge*: This case is before the Court on remand from the U.S. Court of Appeals for the Sixth Circuit. It concerns respondent's disallowance of a short-term capital loss that petitioners, Terry L. Wright and Cheryl A. Wright (together, Wrights), allege is required by the mark-to-market rules in section 1256[2] for their 2002 taxable

---

[1] This Opinion supplements our previously filed opinions *Wright v. Commissioner* (*Wright I*), T.C. Memo. 2011-292, and *Wright v. Commissioner* (*Wright II*), T.C. Memo. 2014-175, *rev'd and remanded*, *Wright v. Commissioner* (*Wright III*), 809 F.3d 877 (6th Cir. 2016).

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts have been rounded to the nearest dollar.

[*2] year.[3] In *Wright I*, we granted respondent's 2011 Motion for Partial Summary Judgment[4] and decided that an over-the-counter foreign currency option entered into by Cyber Advice, LLC (Cyber Advice), a limited liability company wholly owned by the Wrights, was not a "foreign currency contract" as defined in section 1256(g)(2). Relying on *Summitt v. Commissioner*, 134 T.C. 248 (2010), and *Garcia v. Commissioner*, T.C. Memo. 2011-85, we reasoned that Congress did not intend section 1256(g)(2) to apply to a foreign currency option.[5] *Wright I*, T.C. Memo. 2011-292, slip op. at 4–8; *cf.* § 1256(g)(2)(A)(i) (stating that, subject to other requirements, a foreign currency contract means a contract "which requires delivery of, or the settlement of which depends on the value of, a foreign currency which is a currency in which positions are also traded through regulated futures contracts"). The import of our holding was that even under the assumed facts set forth by respondent for purposes of his Motion for Partial Summary Judgment, including the assumed fact that the Wrights assigned the foreign currency option at issue to a charity during their 2002 taxable year,[6] section 1256(c) did not apply to cause the Wrights to recognize a mark-to-market loss on the option's assignment. *See Wright I*, T.C. Memo. 2011-292, slip op. at 2–3, 6, 8. In *Wright II* we upheld respondent's determination that the

---

[3] Respondent's Simultaneous Opening Brief states that in the Notice of Deficiency issued to the Wrights, respondent inadvertently disallowed only a $2,970,822 net short-term capital loss reported by the Wrights instead of the $3,159,176 short-term capital loss the Wrights claimed for the transaction at issue. *Cf.* § 1222(2), (6). Despite the error in the Wrights' favor, respondent does not seek any increase in deficiency and has instead conceded the issue. We accept this concession.

Respondent also states that while he does not agree that an election by the Wrights' wholly owned limited liability company pursuant to section 988(a)(1)(B) and Treasury Regulation § 1.988-3 to treat its foreign currency option gain or loss as capital is valid, he is not challenging the election. *Cf.* § 1256(f)(2) (providing that section 1256(a)(3), which provides that gain or loss with respect to a section 1256 contract shall be treated 40% as short-term capital gain or loss and 60% as long-term capital gain or loss, does not apply to "any gain or loss which, but for such paragraph, would be ordinary income or loss"). We accept that concession as well.

[4] Respondent filed a Motion for Partial Summary Judgment on a different issue in 2017, which we denied in 2022.

[5] Notably, we interpreted the phrase "the settlement of which depends on the value of" in section 1256(g)(2)(A)(i) to refer to cash-settled forward contracts, not options. *See Wright I*, T.C. Memo. 2011-292, slip op. at 7.

[6] Another assumption of note was that "[f]or purposes of the motion, respondent does not contest the legitimacy of trades that petitioners claim they participated in during 2002 through their ownership of" their wholly owned limited liability company. Respondent also expressly stated that he did "not address in this motion other theories [he] will raise at trial in support of adjustments proposed in the notice of deficiency."

**[\*3]** Wrights are liable for a $603,093 income tax deficiency and a $120,619 section 6662(a) accuracy-related penalty.

After the Wrights appealed, however, the Sixth Circuit reversed and remanded this case for further proceedings. *See Wright III*, 809 F.3d at 878, 885. The Sixth Circuit acknowledged that an option does not require delivery or settlement unless the option is exercised. *See id.* at 883. The Sixth Circuit reasoned, however, that the foreign currency option at issue was a foreign currency contract within the meaning of section 1256(g)(2) because its settlement (if it had occurred) would have depended on the value of the euro, a foreign currency in which positions are traded through regulated futures contracts. *See Wright III*, 809 F.3d at 883–85.

We have since held a trial in this case, and respondent now concedes that the Wrights are not liable for the section 6662(a) accuracy-related penalty. The only issue remaining for decision is whether the Wrights are liable for the income tax deficiency that respondent determined for their 2002 taxable year. Respondent, however, no longer concedes (as he did for the limited purpose of his 2011 Motion for Partial Summary Judgment) that the Wrights assigned the foreign currency option at issue to a charity during their 2002 taxable year. Instead, respondent now contends—among several other arguments—that the Wrights have not substantiated the foreign currency option's assignment to charity and that evidence adduced at trial indicates it was not assigned. We do not reach this disputed factual issue, however, because we agree with one of respondent's other arguments: Even if the assignment occurred and caused the Wrights to recognize a loss under section 1256,[7] section 165(c)—a limitation on loss deductibility applicable to individuals—prevents the Wrights from deducting the loss. We therefore hold that the Wrights are liable for the deficiency respondent determined for their 2002 taxable year.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The First, Second, and Third Stipulations of Facts and the accompanying

---

[7] Respondent has also made other arguments that we do not reach, including about (1) whether the option transactions at issue have economic substance, (2) whether the Wrights should be required to recognize gain on the written option they purportedly assigned to charity at the same time they purportedly assigned the purchased option, and (3) whether the Wrights' loss may be limited by section 165(a), section 465, Treasury Regulation § 1.165-1(b), or Treasury Regulation § 1.988-2(f).

[*4] Exhibits are incorporated herein by this reference. The Wrights resided in Tennessee when they timely filed their Petition. When our findings of fact describe the terms, the steps, or any other aspect of a transaction, they extend only to the transaction's form and do not represent a conclusion with respect to the transaction's economic substance or any other legal matter.

I.      *Background*

Mr. Wright has an extensive background in technology. In the early 1990s Mr. Wright founded Convergence Systems, Inc., a cable modem company. In 1999 C-COR Electronics (C-COR) acquired Convergence Systems in a stock swap. As part of the acquisition, Mr. Wright received over 800,000 shares of C-COR stock. Mr. Wright served as C-COR's chief technology officer for one year following the acquisition and then resigned from C-COR in 2000. He purchased a farm after leaving C-COR.

During 2002 Mr. Wright and Mrs. Wright each owned 50% of Cyber Advice, a Georgia limited liability company taxable as a partnership for federal income tax purposes. Mr. Wright was Cyber Advice's president and member manager. The Wrights formed Cyber Advice to hold stock, and they did not do any work through Cyber Advice. Mr. Wright calculated his net worth in 2002 as $6,120,500, computed by subtracting $357,000 of mortgage liabilities from assets he valued at $6,477,500. He reported holding total liquid assets of $225,000.[8]

Mr. Wright sold C-COR stock in April and May 2002, and Cyber Advice made other sales of C-COR stock in June 2002. The long-term capital gains arising from all of the sales totaled $3,456,988. Consequently, the Wrights' estate planning attorney and their accountant realized in 2002 that the Wrights could use tax losses and, in Mr. Wright's words, "asked us if we'd be interested in an alternative tax strategy." The strategy they proposed originated from Multi National Strategies, LLC (Multi National), and its affiliate, Castle Transactions, LLC (Castle), and it involved major-minor foreign currency option transactions. Mr. Wright asked his advisers to explain

---

[8] Although it is not clear how Mr. Wright arrived at the $225,000 liquid asset estimate, a considerable portion of his assets derived from real estate ($2,915,000), stock and securities ($2,046,500), interests in small businesses ($1,040,000), antiques ($350,000), and farm equipment and animals ($95,000), most of which may have been illiquid. He held $31,000 in cash, the only clearly liquid asset on his balance sheet.

[*5] the strategy. His understanding of their explanation included that the strategy involved "foreign currency exchange transactions" and that "[i]f they lost money on it, then we got to write that off."

Cyber Advice authorized Multi National to engage in various over-the-counter foreign currency option transactions during 2002, and Cyber Advice agreed that Beckenham Trading Co., Inc. (Beckenham), would serve as the counterparty to the transactions. On or before December 19, 2002, Cyber Advice transferred $550,000 to a Beckenham account. In total during December 2002 Cyber Advice purchased nine over-the-counter foreign currency options from Beckenham, and it sold nine offsetting over-the-counter foreign currency options to Beckenham. We now discuss two of the purchases and two of the sales that are relevant to respondent's determination of a deficiency.

II.    *Opening of Major-Minor Transaction*

On December 20, 2002, Cyber Advice purchased a euro put option for a nominal premium of $36,177,750 and a euro call option for a nominal premium of $36,177,750. The euro put option gave Cyber Advice the right to sell Beckenham €1,237,477,902 on the option's expiration date (June 13, 2003) for $1.26 billion, and the euro call option gave Cyber Advice the right to buy €1,237,477,902 on the same date for $1.26 billion. In the parlance of foreign currency options, Cyber Advice had purchased a straddle[9] (euro straddle) on the exchange rate between the euro and the dollar (EUR/USD exchange rate). The euro put option and euro call option were European-exercise options, meaning that they could be exercised only at a specified time on their expiration date, not at just any time. The euro put option and the euro call option each also contained a digital kicker, an exotic feature entitling Cyber Advice to a fixed payment of kr. 17,456,309 if the exchange rate between the dollar

---

[9] This use of the term "straddle" bears no relation to its definition in section 1092(c) or its use in section 1256 or elsewhere in the Code. It does not refer to offsetting positions; instead, it refers to an options strategy by which an investor buys a put option on an asset and a call option on the same asset with the same strike price. A straddle allows its buyer to profit from price volatility in an underlying asset without requiring the buyer to predict whether the asset will appreciate or depreciate in price. The buyer may lose money on a straddle position if the asset experiences insufficient price volatility (or the asset's price is otherwise too close to the options' strike price at the time prescribed for option exercise) to generate a payoff covering the cost of the premium it paid to purchase the put and call options. The seller (or writer) of a straddle requires a premium to compensate it for the risk of the potentially unlimited loss it could incur depending on the extent of the difference between the asset's price at the time prescribed for the options' exercise and the options' strike price.

[*6] and the Danish krone (USD/DKK exchange rate) was below 6.8564 at a specified time on the options' expiration date.

Also on December 20, 2002, Cyber Advice sold a put option (DKK put option) to Beckenham for a nominal premium of $36,162,000 and a call option (DKK call option) to Beckenham for a nominal premium of $36,162,000. The DKK put option gave Beckenham the right to sell Cyber Advice kr. 9,198,126,000 on the option's expiration date (June 13, 2003) for $1.26 billion, and the DKK call option gave Beckenham the right to buy kr. 9,198,126,000 from Cyber Advice on the same date for $1.26 billion. In other words, Cyber Advice had sold a straddle (DKK straddle) on the USD/DKK exchange rate to Beckenham. The DKK put option and DKK call option were European-exercise options. The DKK put option and DKK call option each also contained a digital kicker entitling Beckenham to a fixed payment of kr. 17,275,104 if the USD/DKK exchange rate was below 6.8552 at a specified time on the options' expiration date.

At all relevant times, the Danish krone was tightly pegged to the euro by the European Central Bank and the Danish Central Bank such that any movement in the EUR/USD exchange rate would be almost perfectly mirrored by a movement in the USD/DKK exchange rate. In other words, the Danish krone was (and continues to be) a proxy for the euro. Therefore, a sold put option on the USD/DKK exchange rate may act as a hedge or offsetting position with respect to a purchased put option on the EUR/USD exchange rate, depending on the degree of similarity of the options' terms. The same is true for call options. Notably, the euro straddle and the DKK straddle had nearly identical terms in that their component put and call options had the same face amount in U.S. dollars ($1.26 billion), were European-exercise, were struck at the then-prevailing at-the-money forward exchange rate, and had the same expiration dates.

Despite the hefty nominal premiums, Cyber Advice paid only the net premium of the four options, or $31,500, to Beckenham at the outset of the option transactions; Beckenham did not make any payments to Cyber Advice upon entering into the four options.[10] Beckenham did not require Cyber Advice to post any margin collateral in respect of the DKK

---

[10] While the trade confirmation for each of the December 20, 2002, foreign currency option transactions specified a bank account for "[p]ayments to Beckenham," the corresponding field for an "[a]ccount for payments" for "[p]ayments to the [c]ounterparty" (i.e., payments to Cyber Advice) was left blank.

[*7] straddle it sold despite Cyber Advice's potentially unlimited nominal obligations as the DKK straddle's writer. *Cf. supra* note 9.

III.    *Closing of Major-Minor Transaction*

A.    *Alleged Assignment of Put Options*

In this Part III.A, we describe events that the Wrights allege occurred without making any finding about whether they occurred. Although we describe these alleged events in our Findings of Fact to maintain chronological continuity with the previous section (i.e., for ease of reading and reference), we do not make any findings of fact in Part III.A.

On December 23, 2002, Beckenham, Cyber Advice, and the Foundation for an Educated America, Inc. (FEA), purportedly entered into an agreement to assign the euro put option to FEA.[11] Simultaneously with the alleged assignment of the euro put option, Cyber Advice purportedly assigned its obligations under the DKK put option to FEA.

B.    *Put Options' Value*

At the time of their alleged assignment, the euro put option was valued at $33,018,574, and the DKK put option was valued at $33,012,274.  The net value of the allegedly assigned put options was $6,300.

C.    *Termination of Call Options*

Cyber Advice did not assign the euro call option or its obligations under the DKK call option to FEA.  Instead, Cyber Advice and Beckenham closed out those positions by offsetting them on December 23, 2002.  To close out the euro call option it had purchased from Beckenham three days earlier, Cyber Advice sold an offsetting call option to Beckenham for a nominal premium of $39,318,026.  To close out the DKK call option it had sold to Beckenham three days earlier, Cyber Advice purchased an offsetting call option from Beckenham for a nominal premium of $39,311,726.  Thus, by the close of the option

---

[11] Both of FEA's codirectors testified at trial, and their testimony and other evidence cast some doubt on the assumed facts related to the assignment of the euro put option and DKK put option that we relied upon in *Wright I* and that the Sixth Circuit relied upon in *Wright III*.  We need not decide which party has the better position on this disputed factual issue, however.

**[*8]** transactions at issue, Cyber Advice had paid only $25,200 ($31,500 previously paid plus $39,311,726 nominally paid minus $39,318,026 nominally received) to engage in the option transactions, excluding transaction costs.[12]  Regarding transaction costs, Cyber Advice paid $25,000 to Larry C. Fedro & Associates, P.A., for a tax opinion letter (Fedro opinion letter), and it paid $27,500 for purported management fees from its Multi National account, although some portions of these costs are likely allocable to other transactions in which Cyber Advice engaged that are not at issue in this case.

Although the Fedro opinion letter is dated December 20, 2002, its author, Larry Fedro, did not communicate with the Wrights until March 9, 2003, the date Mr. Fedro delivered his opinion letter to the Wrights. Mr. Fedro lacked familiarity with foreign currency options, and it was not his practice to meet with or advise taxpayers before they entered into major-minor foreign currency option transactions.  To form his opinion, Mr. Fedro relied on investor representations supplied by the Wrights, including representations with respect to the transactions' expected rate of return.

IV.    *Tax Reporting and Notice of Deficiency*

By way of background for Cyber Advice's tax reporting, section 1256(a) provides for the mark-to-market recognition of gain or loss on section 1256 contracts (including foreign currency contracts, *see* § 1256(b)) at the end of each taxable year.  It further provides that any such gain or loss shall be treated 40% as short-term capital gain or loss and 60% as long-term capital gain or loss.  *Cf.* § 1256(f)(2) (providing that capital gain or loss treatment does not apply to ordinary income property); *supra* note 3 (accepting respondent's decision not to challenge Cyber Advice's election to treat foreign currency options as capital assets).  Section 1256(c) extends these rules "to the termination (or transfer) during the taxable year of the taxpayer's obligation (or rights) with respect to a section 1256 contract by offsetting, by taking or making

---

[12] It is possible to arrive at an even lower figure, $18,900, for what the Wrights paid to engage in the option transactions by subtracting from the $25,200 paid another $6,300 received in respect of the difference between the value of the euro put option, $33,018,574, and the value of the DKK put option, $33,012,274, at the time of their alleged assignment to FEA.  *Cf. supra* Part III.B.  Because we have not found as fact the alleged assignment of the euro put option and DKK put option to FEA, however, we need not address here whether such a reduction would be appropriate.

**[\*9]** delivery, by exercise or being exercised, *by assignment or being assigned*, by lapse, or otherwise." (Emphasis added.)

Cyber Advice, relying on *Greene v. United States*, 79 F.3d 1348 (2d Cir. 1996), took the position that the purported assignment of the euro put option to FEA resulted in a termination as defined in section 1256(c). Cyber Advice reported a short-term capital loss of $3,159,176 on Schedule D, Capital Gains and Losses, of its 2002 Form 1065, U.S. Return of Partnership Income, in respect of the euro put option's assignment. Because Cyber Advice was taxed as a partnership for the year at issue, the loss flowed through to the Wrights. Cyber Advice did not report any gain or loss in respect of the DKK put option's alleged assignment on Schedule D. Cyber Advice reported a $3,140,276 gain from the termination of the euro call option and a $3,149,276 loss from the termination of the DKK call option. On October 2, 2009, respondent issued a Notice of Deficiency for the Wrights' 2002 taxable year.

## OPINION

### I.    *Jurisdiction and Burden of Proof*

We have jurisdiction to resolve this case under section 6213(a).[13] The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving that the determinations are incorrect. *See* Rule 142(a)(1); *see also Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Ekman v. Commissioner*, 184 F.3d 522, 524 (6th Cir. 1999), *aff'g* T.C. Memo. 1997-318. Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they are entitled to any deduction claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). A taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax

---

[13] The Wrights were Cyber Advice's only partners during 2002. Accordingly, we have jurisdiction to redetermine respondent's determinations without regard to the unified partnership audit and litigation procedures prescribed by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71 (codified at sections 6221–6234). *See* § 6231(a)(1)(B)(i); *Rutkoske v. Commissioner*, 149 T.C. 133, 135 n.2 (2017) (explaining and applying TEFRA's small partnership exception); *Hohl v. Commissioner*, T.C. Memo. 2021-5, at \*9 & n.4. TEFRA was repealed for returns filed for partnership tax years beginning after December 31, 2017. *See Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at \*3 n.5, *appeal docketed*, No. 24-12661 (11th Cir. Aug. 19, 2024).

**[*10]** liability. *See* § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

Under section 7491(a), if the taxpayer provides credible evidence concerning any factual issue relevant to ascertaining the taxpayer's liability and complies with certain other requirements, the burden of proof shifts to the Commissioner as to the factual issue. The Wrights do not contend that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact. Therefore, the Wrights bear the burden of proof.

II.    *Section 165(c)*

Respondent has invoked several theories to support his determination of a deficiency, but we need address only one of them. Section 165(a) generally allows a deduction for any loss sustained during the taxable year if it is not compensated for by insurance or otherwise. *Cf.* Treas. Reg. § 1.165-1(b) ("To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and . . . actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss."). In the case of an individual, however, the deduction is limited to: (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business or a transaction entered into for profit, where the losses "arise from fire, storm, shipwreck, or other casualty, or from theft." § 165(c). Section 703(a) applies this limitation to partnerships. *See Kelley v. Commissioner*, T.C. Memo. 1993-495, 1993 WL 432467, at *15; *see also United States v. Basye*, 410 U.S. 441, 448 (1973); *Ewing v. Commissioner*, 91 T.C. 396, 416–17 (1988), *aff'd without published opinion*, 940 F.2d 1534 (9th Cir. 1991); *Wilson v. Commissioner*, T.C. Memo. 1980-514, 1980 Tax Ct. Memo LEXIS 69, at *15–16. Only the second category, which is found in section 165(c)(2), is at issue here. The first and third categories are inapplicable.

"[S]ection 165(c)(2) requires a primary profit motive if a loss from a particular transaction is to be deductible." *Fox v. Commissioner*, 82 T.C. 1001, 1021 (1984); *see Ewing*, 91 T.C. at 416–18; *see also United States v. Generes*, 405 U.S. 93, 104–05 (1972); *Dewees v. Commissioner*, 870 F.2d 21, 33 (1st Cir. 1989) (collecting cases); *cf. Illes v.*

**[*11]** *Commissioner*, 982 F.2d 163, 165–66 (6th Cir. 1992) (declining, where a taxpayer "stipulated that [a] transaction lacked economic substance," to "make the more difficult determination of the taxpayer's intent" but suggesting in dicta that section 165(c)(2) would require examining whether the taxpayer was "actually, honestly, and exclusively motivated by profit"), *aff'g* T.C. Memo. 1991-449. When a taxpayer makes an investment through a partnership, the existence of a profit motive is determined at the partnership level. *See Ewing*, 91 T.C. at 416–17; *Andros v. Commissioner*, T.C. Memo. 1996-133, slip op. at 44–45. Thus, even assuming arguendo that the Wrights sustained an otherwise deductible loss by allegedly assigning the euro put option to FEA, they must still prove that Cyber Advice entered into the December 20, 2002, foreign currency option transactions with the primary motive of making a profit.

In determining whether a taxpayer entered into a transaction primarily for profit, we typically apply the following guidelines:

1. The ultimate issue is profit motive and not profit potential. However, profit potential is a relevant factor to be considered in determining profit motive.

2. Profit motive refers to economic profit independent of tax savings.

3. The deductibility or nondeductibility of a loss is determined by the overall scheme, not merely by the losing legs of a position.

4. If there are two or more motives, it must be determined which is primary, or of first importance. The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent.

5. Because the statute speaks of motive in entering a transaction, the main focus must be at the time the transactions were initiated. However, all circumstances surrounding the transactions are material to the question of intent.

*See Ewing*, 91 T.C. at 417–18; *Andros*, T.C. Memo. 1996-133, slip op. at 45–46. An incidental profit motive is insufficient, but profit need not be the sole motive. *See Fox*, 82 T.C. at 1019. Upon a "threshold determination that a particular transaction was entered into primarily for tax reasons," however, we may "relax" the requirement of a primary profit motive "to allow for those essentially tax-motivated transactions

**[*12]** which are unmistakably within the contemplation of Congressional intent." *Id.* at 1021.

Any profit motive Cyber Advice may have had for entering into the December 20, 2002, foreign currency option transactions is indiscernible on the record before us. Respondent's expert David DeRosa credibly opined that "the profit or loss on the [euro straddle] would be nearly perfectly offset by the profit or loss on the short [DKK straddle]." This is unsurprising because the Danish krone is a close proxy for the euro, and the four component options had the same face amounts in U.S. dollars, had the same expiration dates, were struck at the then-prevailing at-the-money forward exchange rates, and were European-exercise options.[14] Even though the positions offset nearly perfectly, however, Cyber Advice could expect that it would always have a loss in one component option of the euro straddle that it purchased, which it could terminate (along with the offsetting sold position in a minor currency) at its discretion to generate an artificial capital loss.[15]

We credit Mr. DeRosa's calculation of the expected rate of return on the December 20, 2002, foreign currency option transactions, which accounts for the $31,500 net premium paid by Cyber Advice at the outset, as somewhere between negative 67.35% (excluding transaction costs) and negative 81.62% (including certain apportioned transaction costs). *Cf. id.* at 1024 ("It is doubtful that trading could ever have been sustained at economical levels without the associated tax benefits."). Although the Wrights argue that the option transactions were intended to diversify the Wrights' portfolio and produce a positive rate of return, Mr. Wright credibly testified that the option transactions were "more for the tax benefit" and that "[t]he diversification [of the Wrights' investments] was through" other transactions undertaken on Cyber Advice's behalf.

---

[14] In other words, as Mr. DeRosa explained, the options took advantage of a "basic axiom of option pricing theory called put-call parity," an important implication of which "is that European exercise puts and calls on the same exchange rate, having the same strike price, expiration date, and face amounts must be equal [in price] to each other if they are struck at the then-prevailing forward outright exchange rate." Although different exchange rates, the EUR/USD exchange rate and the USD/DKK exchange rate, were used in this case, the Danish krone is a very close proxy for the euro.

[15] Respondent has raised the issue that the alleged simultaneous assignment of the offsetting DKK put option should cause the Wrights to recognize gain in 2002, but we do not reach it.

**[*13]** Cyber Advice and Beckenham treated the transactions as offsetting: They offset the enormous nominal premiums due under the euro straddle and the DKK straddle against each other, resulting in only a $31,500 net premium payment by Cyber Advice. Neither Cyber Advice nor Beckenham required the other to post margin collateral to secure the performance of the other's sizable nominal obligations. Mr. DeRosa credibly opined that it is standard practice for derivatives dealers to require a counterparty selling a derivative to post margin collateral with the dealer and that negotiations regarding margin requirements are heavily documented and discussed between the parties involved. The Wrights have not adequately explained the failure of either Cyber Advice or Beckenham to post margin collateral or otherwise secure the performance of the obligations it was owed. In addition, the pretextual nature of the trade confirmations for the transactions at issue is shown by their erroneous references to a "coupon Fixing Date," a term that has no application to the options in which Cyber Advice transacted. Cyber Advice intended to enter into transactions that were offsetting at best (before taking into account net premium and transaction costs), and it therefore lacked the profit motive needed to allow the Wrights to deduct any loss arising from the transaction.

Other considerations support this conclusion. The Wrights realized substantial capital gains on the sale of Mr. Wright's C-COR stock in the first half of 2002. Mr. Wright credibly testified that in 2002 his estate planning attorney and his accountant "realized that we could use some tax losses." Mr. Wright also credibly testified that he first understood that the foreign currency option transactions at issue would generate a tax loss based on an explanation from his estate planning attorney in fall 2002. Cyber Advice then entered into the foreign currency option transactions at issue, which generated a valuable capital loss, just before the end of the Wrights' 2002 taxable year. *See id.* at 1017 (noting that the taxpayer entered into option transactions "only after his accountant and tax advisor . . . had investigated their tax benefits" and that "[t]he bulk of trading . . . occurred in November, December and January"); *Walker v. Commissioner*, T.C. Memo. 1990-609, 1990 Tax Ct. Memo LEXIS 691, at *13 ("We find it highly persuasive that [the taxpayer's] commodity futures activity coincided, at year's end, with the realization of a large short-term capital gain. [The taxpayer] would be faced with a substantial tax due to his disposition of . . . stock, and was in need of short-term capital losses to offset the gains. . . . [The taxpayer] offered no satisfactory explanation as to why the majority of his acquisitions took place during a two-month period."). The Wrights held their positions in the options for only three days before

**[\*14]** allegedly assigning the put options to FEA, and Mr. Wright credibly testified that he had no experience with foreign currency transactions. The Wrights have failed to prove that Cyber Advice had any profit motive (let alone a primary profit motive) for entering into the December 20, 2002, foreign currency option transactions. We emphasize that we do not hold that a transaction on the terms described here could never be attended by a profit motive (such as a motive to speculate on the possibility that two currencies will decouple from each other[16] or for other bona fide business or investment reasons), but only that the record here discloses no such motive on Cyber Advice's part. In fact, this is a case where "[t]he absence of a primary for-profit objective is 'so obvious that it must be the same for all of the individual partners or their [partnership].'" *Andros*, T.C. Memo. 1996-133, slip op. at 53 (quoting *Donahue v. Commissioner*, T.C. Memo. 1991-181, 1991 Tax Ct. Memo LEXIS 208, at \*31, *aff'd without published opinion*, 959 F.2d 234 (6th Cir. 1992), *and aff'd sub nom. Pasternak v. Commissioner*, 990 F.2d 893 (6th Cir. 1993)).

It is true that the euro straddle and the DKK straddle had different currencies as underlying assets. Mr. DeRosa credibly opined, however, that the Danish krone was a very close proxy for the euro. *See supra* note 14. In other words, Cyber Advice did not have to worry about divergence between the euro and the Danish krone—especially during the short three-day period in which it traded—because they were (and are) officially linked. He also credibly opined that the mirror-image terms of the euro straddle and the DKK straddle had the effect that "what Cyber Advice gained on the [euro straddle] it lost on the [DKK straddle], and vice-versa." Therefore, the euro straddle and the DKK straddle are properly viewed either as offsetting positions or as so nearly offsetting as to negate any possible profit motive under the circumstances here, which include substantial transaction costs.

---

[16] Mr. DeRosa, however, credibly opined that even in the event the euro decoupled from the Danish krone, "[t]he detachment of [the Danish krone] from [the euro] would . . . affect [the USD/DKK exchange rate] but not necessarily [the EUR/USD exchange rate]. . . . Cyber Advice . . . is short the [DKK straddle] and this means that any movement – whether up or down – in [the USD/DKK exchange rate] would be to its detriment." Mr. DeRosa also credibly opined that under normal circumstances, "one could reasonably expect that movements in the [exchange rate between the euro and Danish krone] would be minimal."

**[\*15]**  It is highly doubtful that Cyber Advice, whose only members were the Wrights,[17] even had the ability to purchase the euro put option on a standalone basis (i.e., without entering into offsetting transactions and receiving the benefit of premium netting).[18]  Mr. Wright's net worth in 2002 ($6,120,500) was less than 17% of the premiums Cyber Advice nominally owed for purchasing the euro put option ($36,177,750).  This already-low percentage would be much lower if Mr. Wright's liquid assets ($225,000) were used instead of his net worth, which included illiquid assets.  In addition, the cash balance in Cyber Advice's account with Multi National was only $550,000 on December 19, 2002, one day before the transactions at issue.  There is no evidence of any deposit into the account on December 20, 2002, the day the transactions occurred.  The Wrights' ability to enter into the option transactions at issue was therefore highly dependent on premium netting, which Beckenham permitted only because the option transactions were almost perfectly offsetting.

The digital kicker appended to the options does not change the result.  While the digital kicker on the euro straddle paid out at a slightly higher level (USD/DKK exchange rate < 6.8564) than the level at which the digital kicker on the DKK straddle paid out (USD/DKK exchange rate < 6.8552), Mr. DeRosa credibly opined that this difference was "very small" and that Cyber Advice would never receive a sweet spot payout (i.e., a digital kicker payout under the euro straddle without owing a largely offsetting amount to Beckenham in respect of the digital kicker on the DKK straddle).  *Cf. Humboldt Shelby Holding Corp. & Subs. v. Commissioner*, T.C. Memo. 2014-47, at \*6 ("A party that intends to use digital options to generate tax losses usually will not purchase and sell options that offset completely, because a transaction that could not produce a gain or loss would too obviously lack economic substance.  Instead, the party will usually purchase and sell options that ostensibly provide an opportunity for gain or loss.  To accomplish this, the party will purchase options that only mostly offset. . . . The sweet spot is the range of prices between the strike price for the purchased option and the strike price for the sold option. . . . Hitting the sweet spot can result in

---

[17] While the record does not disclose Mrs. Wright's net worth in 2002, there is no evidence that it was substantial.

[18] Cyber Advice's ability to post margin collateral if it had sold the DKK straddle (or either component of it) on a standalone basis, which any rational counterparty would have required, is similarly doubtful.

**[\*16]** a very large windfall for an investor, but the probability of hitting it is usually very low."), *aff'd*, 606 F. App'x 20 (2d Cir. 2015).

Moreover, Mr. DeRosa credibly opined that because the options' confirmations only required Beckenham, as the options' calculation agent, to determine the applicable USD/DKK exchange rate in a good faith manner, Beckenham had "wide latitude in selecting the USD/DKK [exchange] rate." Among a number of possible methods, because "the bid-ask spread [of the USD/DKK exchange rate] would have been at least [0.0015 to 0.0020 Danish kroner]," Beckenham "could have avoided a sweet spot payout by simply selecting either the bid or the ask of a USD/DKK exchange rate to assure that the USD/DKK digital kickers were all in-the-money or out-of-the-money together." Beckenham had a significant incentive to do so to avoid being obligated to make two payments of kr. 17,456,309 each to Cyber Advice without being entitled to two largely offsetting payments from Cyber Advice. *Cf. id.* at \*9–10. Cyber Advice did not take the possibility of a sweet spot payment seriously because it did not require Beckenham to post any margin collateral or otherwise mitigate the counterparty risk that it would fail to make a sweet spot payment to Cyber Advice. Consequently, although taken together the digital kickers "ostensibly provided for three potential outcomes, only two were possible." *Id.* at \*10. Specifically, the digital kickers could have (1) expired in the money together, generating two payments of kr. 17,456,309 each by Beckenham and two largely offsetting payments of kr. 17,275,104 each by Cyber Advice, or (2) expired out of the money together, generating no return. Mr. DeRosa considered both of these outcomes in calculating the expected rate of return for the option transactions at issue. The Wrights have failed to prove that Cyber Advice entered into the December 20, 2002, foreign currency option transactions for profit.[19] *Cf. id.* at \*16 ("Although the transaction had some profit potential, that potential was not significant enough to persuade us that [the taxpayer] engaged in the transaction for any nontax business reason.").

The Wrights have attempted to establish that they or Cyber Advice had a sufficient profit motive to support the deductibility of the claimed loss, but none of their arguments is persuasive. We note at the outset that no representative of Multi National, Castle, or Beckenham

---

[19] Because the Wrights have not proven that they engaged in the option transactions at issue primarily for profit, neither have they proven that they were "actually, honestly, and exclusively motivated by profit." *See Illes v. Commissioner*, 982 F.2d at 165.

[*17] testified at trial, nor did the Wrights' estate planning attorney. We do not credit Mr. Wright's imprecise and uncorroborated testimony about statements or advice he allegedly relied on from those sources.[20] That testimony is entitled to little weight in the light of the overwhelming evidence that Cyber Advice undertook the option transactions in order to generate artificial capital losses before yearend 2002. We will, however, credit Mr. Wright's testimony that unnamed accountants advised him against the option transactions. Because none of those accountants testified, however, we lack adequate insight into their reasoning. We do not credit Mr. Wright's vague and uncorroborated testimony about the reasons for which they advised him against the transactions. While the Wrights allege they left their former money manager because he failed to make a profit for them, which supposedly indicates they had a profit motive for dealing with Castle, this does not establish that the Wrights were motivated to make a pretax profit on the option transactions as opposed to an after-tax one.

The Wrights argue that their expert witness, William Jennings, "examined the transactions and found that [the Wrights] had an opportunity to profit from them." We give no weight to Mr. Jennings's report, and we instead credit Mr. DeRosa's rebuttal report addressing Mr. Jennings's report. Mr. Jennings, although he has personally traded foreign currency,[21] has no professional experience or expertise with respect to foreign currency options. Mr. Jennings relied almost exclusively on offering documents (i.e., marketing materials) and did not perform any independent analysis of the transactions at issue. His report is little more than an attempt to give those marketing materials a patina of expert approval. Mr. Jennings's report simply does not engage with or bear on the bulk of Mr. DeRosa's analysis or respondent's case. *Cf. Endeavor Partners Fund, LLC v. Commissioner*, T.C. Memo. 2018-96, at *43 ("There was . . . a theoretical possibility that Denmark could lift the krone's peg to the euro. [The taxpayers' expert witness]

---

[20] Furthermore, with respect to Mr. Wright's testimony that Castle promised him a 60% chance of a 16% internal rate of return, Castle's alleged statement is virtually meaningless if, for example, Castle was also implying that there was a 40% chance of a total or near-total loss of net premium. Mr. Wright's testimony is also unclear with respect to whether the allegedly promised return was computed on a pretax or an after-tax basis and whether it was computed by including or excluding transaction costs. Therefore, even if we were to credit Mr. Wright's testimony, the Wrights have not laid an adequate foundation to show that Castle promised Mr. Wright a positive pretax economic return on the transactions at issue.

[21] Mr. Jennings's personal trading experience did not include pricing exotic foreign currency options, however.

**[\*18]** did not estimate the likelihood that a 'depeg' might occur or calculate how such an event would affect the transactions' profit potential."), *aff'd*, 943 F.3d 464 (D.C. Cir. 2019). Although Mr. Jennings's report is unhelpful for various reasons, it is especially unhelpful to the extent it opines that the Wrights "entered into the transactions for business reasons with the intent to produce a significant economic profit," which is a factual assertion about the Wrights' intent in 2002 about which Mr. Jennings—who is not a fact witness and who was unfamiliar with the case until 2023—lacks personal knowledge.

The Wrights also argue that the option transactions at issue should be viewed together with other transactions in which Cyber Advice engaged. The Wrights, however, have only named the other investments and have not adequately explained what they were or how they functioned. Mr. Wright credibly testified that he "never figured out what [an investment called RCG] was." Mr. Wright also distinguished at trial between the foreign currency option transactions, which were "more for the tax benefit," and other transactions in which Cyber Advice engaged. Mr. Jennings did not purport to quantify the other investments' effect on the Wrights' overall expected rate of return for Cyber Advice's investment portfolio. In any case, it is proper to view the option transactions at issue separately from the rest of Cyber Advice's portfolio because they are closely interrelated and designed to work together to produce an artificial capital loss. *Cf. Thurner v. Commissioner*, T.C. Memo. 1990-529, 1990 Tax Ct. Memo LEXIS 583, at \*45 ("[The taxpayer] has entered into many other transactions primarily for profit over a period of many years, including the years at issue here. However, it does not necessarily follow that the trades at issue were entered into for primarily profit. We treat these transactions differently from [the taxpayer's] other trades in part because [the taxpayer] himself treated them differently. . . . In his other trades we have no reason to believe that he . . . sold a loss leg almost immediately after buying it . . . .").

The Wrights further argue that Mr. Wright somehow relied on the Fedro opinion letter or on Mr. Fedro. Mr. Fedro did not testify at trial, but his deposition testimony is in evidence. Mr. Fedro never communicated with the Wrights until March 9, 2003, months after the Wrights allege the option transactions closed. Although the Fedro opinion letter is dated December 20, 2002, he delivered his opinion letter to the Wrights on March 9, 2003. Mr. Fedro lacked familiarity with foreign currency options, and it was not his practice to meet with or

**[\*19]** advise taxpayers before they entered into major-minor foreign currency option transactions. Like Mr. Jennings, Mr. Fedro did not perform an independent economic analysis of the transactions at issue. Instead, he relied—and, given his lack of expertise, needed to rely—on representations supplied by the Wrights, including representations as to the transactions' expected rate of return.

The Wrights argue that sections 1211(b) and 1256(a) override the application of section 165 with respect to losses arising from the sale or exchange[22] of capital assets.[23] Before we discuss these provisions, we note initially that the Code coordinates section 165 with section 1211 because section 165(f) provides that "[l]osses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212." We discern, however, that the Wrights may mean to argue that sections 165(f), 1211(b), and 1256(a) override section 165(c)—and other provisions of section 165 or the regulations under it—to allow a capital loss that section 165(c) or those other provisions would disallow. Even as restated, this argument is without merit.

We begin addressing the Wrights' argument by providing some background. For individual taxpayers, capital losses are generally deductible only to the extent of capital gains. *See* § 1211(b). If such losses exceed such gains, a limited portion of the excess loss (up to $3,000 in most cases) is deductible against ordinary income for the year of the loss. *See id.*; Treas. Reg. § 1.1211-1(b)(1). The remainder of the loss (as adjusted under section 1212(b)(2)) is carried forward indefinitely until it is fully absorbed by offsetting income in future years. *See* § 1212(b)(1). Section 1212(c) provides for an election to carry back losses from section

---

[22] Although sections 165(f) and 1211(b) address losses "from *sales or exchanges* of capital assets" (emphasis added), Cyber Advice's alleged assignment of the euro put option to FEA is properly characterized as a sale for this purpose for the following reasons. The Sixth Circuit held in *Wright III* that the euro put option is a foreign currency contract and therefore a section 1256 contract. *See* § 1256(b). Section 1256(a)(1) provides that "each section 1256 contract held by the taxpayer . . . shall be *treated as sold*" (emphasis added) at a specified time, and section 1256(c) applies the rule of section 1256(a)(1) to assignments. The euro put option's alleged assignment would, if proved, therefore be a sale for purposes of sections 165(f) and 1211(b). This is true even though, generally speaking, "[t]he touchstone for sale or exchange treatment is consideration." *La Rue v. Commissioner*, 90 T.C. 465, 483 (1988).

[23] We note again that respondent is not challenging Cyber Advice's election pursuant to section 988(a)(1)(B) and Treasury Regulation § 1.988-3 to treat its foreign currency option gain or loss as capital, *see supra* note 3, which means by implication that respondent is not challenging the euro put option's status as a capital asset, *cf.* § 988(a)(1)(B).

**[\*20]** 1256 contracts to offset prior gains from such contracts, but we do not discuss it further because there is no evidence that the Wrights made such an election or had any prior gains from section 1256 contracts.

Putting aside section 1256(a) for the moment, the thrust of the Wrights' argument is that because section 1211(b) allows the deduction of capital losses to a specified extent, it must provide a standalone capital loss deduction unmoored from other provisions of the Code limiting the deductibility of losses. Our precedent, however, forecloses that line of argument. *See Wilson v. Commissioner*, 49 T.C. 406, 414–15 (1968) ("A capital loss deduction is allowed to an individual only if the loss was incurred in a trade or business or in a transaction entered into for profit."), *rev'd in part on other grounds*, 412 F.2d 314 (6th Cir. 1969); *DeWoskin v. Commissioner*, 35 T.C. 356, 364 (1960); *Winkler v. Commissioner*, 2 T.C. 735 (1943) (rejecting the same argument on the basis of substantially similar provisions of the Internal Revenue Code of 1939), *aff'd*, 143 F.2d 483 (2d Cir. 1944). Accordingly, we have applied section 165(c) to disallow artificial capital loss deductions by individuals. *See, e.g.*, *Smith v. Commissioner*, 78 T.C. 350, 390–94 (1982); *Andros*, T.C. Memo. 1996-133, slip op. at 20–21, 24, 43–56.

Our longstanding precedent is well grounded in the Code's text and structure. Section 1211 (titled "Limitation on capital losses") does not allow the deduction of a loss outright but instead allows a loss "only to the extent of" a specified amount. Accordingly, we have interpreted section 1211(b) to "place[] limitations on the allowability of capital losses for individuals." *Jamie v. Commissioner*, T.C. Memo. 2007-22, 2007 WL 325769, at \*2. It has not been interpreted to remove limitations on the allowability of capital losses. *Cf. Perry v. Commissioner*, T.C. Memo. 2006-77, 2006 WL 1007618, at \*1 (sustaining "the $3,000 capital loss allowance limitation of section 1211(b)" against a taxpayer's constitutional challenge).

Likewise, section 165(f) expressly provides an additional limitation on the deductible amount of a loss, not authority for transmogrifying a disallowed loss into a deductible one via legal alchemy. *See Yarbro v. Commissioner*, T.C. Memo. 1982-675, 1982 Tax Ct. Memo LEXIS 74, at \*6–7 ("Sections 165(a), (c)(1), and (c)(2) allow a deduction for losses incurred in a trade or business and losses incurred in any transaction entered into for profit. These sections are limited by section 165(f) which provides that losses from sales or exchanges of capital assets shall be allowed only to the extent permitted in sections

**[\*21]** 1211 and 1212."), *aff'd*, 737 F.2d 479 (5th Cir. 1984); Treas. Reg. § 1.165-1(c)(3). Although section 1211(b) does not expressly state that the limitations of section 165 apply, it does not need to: The Code's provisions defining capital loss recognize and incorporate those limitations. *See* § 1222(2), (4) (providing that a capital loss is a loss from the sale or exchange of a capital asset "if and to the extent that such loss is taken into account in computing taxable income"); *Winkler*, 2 T.C. at 738. Reading section 1211(b) to provide a standalone loss deduction would make redundant the phrase "if and to the extent that such loss is taken into account in computing taxable income" in section 1222(2) and (4). That is so because, under the Wrights' reading, every loss from the sale or exchange of a capital asset would be taken into account in computing taxable income. *Cf.* Treas. Reg. § 1.1222-1(a) (stating that the phrase "taken into account in computing taxable income" does not refer to the disallowance of a loss by operation of section 1211).

Finally, section 1256(a) does not change this analysis. Section 1256(a)(1) and (3) concerns the timing and character of gain or loss from the sale deemed by section 1256(a), not the ultimate allowability of a deduction in respect of any such loss for purposes of computing taxable income under section 63.[24] *Cf.* § 161; *Winkler*, 2 T.C. at 738 (stating, in relation to a different provision, that "[c]learly, no loss deduction is authorized by this subsection"). Other provisions, including sections 165, 1211(b), and 1212(b), work together to govern the extent to which a loss arising from a section 1256(a) deemed sale is allowable as a deduction. If Congress intended to permit the deduction of a loss arising from a section 1256(a) deemed sale without regard to any other Code

---

[24] For instance, with respect to section 1256(a)(3), the statute's use of defined terms makes this point clear. Section 1256(a)(3) provides in relevant part that any loss with respect to a section 1256 contract shall be treated as "short-term capital . . . loss, to the extent of 40 percent of such . . . loss" and "long-term capital . . . loss, to the extent of 60 percent of such . . . loss." Section 1222(2) defines short-term capital loss for purposes of subtitle A of the Code as "loss from the sale or exchange of a capital asset held for not more than 1 year, if and to the extent that such loss is taken into account in computing taxable income." Section 1222(4) defines long-term capital loss for purposes of subtitle A of the Code as "loss from the sale or exchange of a capital asset held for more than 1 year, if and to the extent that such loss is taken into account in computing taxable income." Therefore, read in context, section 1256(a)(3) provides in relevant part that any loss with respect to a section 1256 contract shall be treated as (1) loss from the sale or exchange of a capital asset held for not more than one year, if and to the extent that such loss is taken into account in computing taxable income, to the extent of 40% of such loss and (2) loss from the sale or exchange of a capital asset held for more than one year, if and to the extent that such loss is taken into account in computing taxable income, to the extent of 60% of such loss.

**[\*22]** provision, it could have—and should have—said so expressly. *Cf. Horn v. Commissioner*, 968 F.2d 1229, 1234–36 (D.C. Cir. 1992) (holding that a different provision authorized a loss deduction because it expressly deemed certain losses to be losses incurred in a trade or business, even though it arguably "grant[ed] beneficial tax treatment to economically meaningless behavior"), *rev'g and remanding Fox v. Commissioner*, T.C. Memo. 1988-570, *and rev'g and remanding Kazi v. Commissioner*, T.C. Memo. 1991-37. We conclude that sections 1211, 1256, and 165(f) do not override section 165(c) in any manner.

The Wrights also argue that the Sixth Circuit's opinion in *Wright III* somehow precludes us from considering any issues other than economic substance. They state that the Sixth Circuit "determined that there was one remaining issue on which the Tax Court had failed to rule, the question of economic substance." While it is true that "[a] holding on an issue by an appellate court must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court," *Pollei v. Commissioner*, 94 T.C. 595, 601 (1990), the Wrights' description of what the Sixth Circuit held in *Wright III* is highly inaccurate. The Sixth Circuit held that we should not have granted partial summary judgment to respondent because our determination that a foreign currency option could not be a foreign currency contract within the meaning of section 1256 was incorrect as a matter of law. *Wright III*, 809 F.3d at 881, 883–85. It therefore "remanded for further proceedings consistent with [its] opinion." *Id.* at 885. The Sixth Circuit did not state that it was limiting our consideration of any issues on remand. *Wright I* and *Wright III* addressed respondent's 2011 Motion for Partial Summary Judgment, which merely tested a single legal question. Respondent's Motion expressly reserved the application of other legal theories and spelled out its Motion-specific assumptions regarding factual matters. *See supra* note 6 and accompanying text. While the Sixth Circuit mentioned the economic substance doctrine as an "escape hatch[]" from the "adverse tax policy outcome" that the Wrights would now have us adopt, *Wright III*, 809 F.3d at 885, it did so in support of its decision not "to try to achieve such a result by torturing the plain language of the statute," *id.* It did not hold that other "escape hatches," *id.*, do not exist or that respondent was precluded from invoking them on remand. Indeed, we do not see how doing so would have been consistent with either its reasoning or the then-existing procedural posture of the case. Furthermore, if the parties intended to restrict our review of the issues, they could have filed a stipulation of settled issues. Finally, we note that our analysis pursuant to section 165(c) is fairly understood as

[*23] considering the substance of the option transactions at issue, albeit through a somewhat different framework from the one furnished by the economic substance doctrine.

The only matter remaining for our consideration is whether the tax-motivated transactions Cyber Advice engaged in are unmistakably within the contemplation of congressional intent. We conclude that they are not. In enacting section 1256, Congress did not intend to permit tax-motivated transactions or otherwise displace the operation of section 165(c)(2). To the contrary,

> [t]he legislative history demonstrates that the statute was enacted in order to harmonize tax treatment of commodity futures contracts with the economic realities of the marketplace. In so doing, Congress hoped to "end th[e] use of futures for tax-avoidance purposes, establish an accurate method of determining a taxpayer's futures income (or loss), and ease tax administration and paperwork for both Government officials and taxpayers." S. Rep. No. 144, 97th Cong., 1st Sess. 156 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 255 . . . .

*Greene*, 79 F.3d at 1356. Likewise, Congress did not contemplate transactions of this sort in its enactment of section 165. *See Fox*, 82 T.C. at 1025 ("We need only look to the policies and history of section 165(c)(2) to see that transactions such as these, in which paper losses enormously exceeded the amounts actually at risk, were utterly outside the contemplation of Congress."); *id.* at 1027 ("Congress permitted the deduction of nonbusiness losses in order to more accurately tax true economic position. The limitation of such deductions to profit-seeking transactions was a necessary protection against abuses such as the tax-motivated transactions before us here."). The Wrights' lengthy run-in with section 1256 and respondent may not have eased tax administration and paperwork for either government officials or taxpayers, but the Code does prevent the Wrights from using foreign currency option transactions for tax avoidance purposes. The Wrights are liable for the income tax deficiency that respondent determined for their 2002 taxable year. They are not liable for the section 6662(a) accuracy-related penalty in view of respondent's concession of the issue.

We have considered all of the parties' arguments and, to the extent they are not discussed herein, find them to be irrelevant, moot, or without merit.

**[*24]**  To reflect the foregoing,

*Decision will be entered for respondent as to the deficiency and for petitioners as to the accuracy-related penalty under section 6662(a).*